**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| ARELI HERNANDEZ-JEANS, | ) | CASE NO.  1:10-cv-1135 |
| | ) | |
| Plaintiff, | ) | |
| | ) | MAGISTRATE JUDGE |
| v. | ) | VECCHIARELLI |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | **MEMORANDUM OPINION AND** |
| Defendant. | ) | **ORDER** |

Plaintiff, Areli Hernandez-Jeans ("Plaintiff"), challenges the final decision of

Defendant, Michael J. Astrue, Commissioner of Social Security ("the Commissioner"),

denying Plaintiff's applications for a Period of Disability ("POD") and Disability Insurance

Benefits ("DIB"), and Supplemental Security Income ("SSI") under Titles II and XVI of

the Social Security Act, 42 U.S.C. §§ 416(i), 423, 1381 *et seq.* ("the Act").  This Court

has jurisdiction pursuant to 42 U.S.C. § 405(g).  This case is before the undersigned

United States Magistrate Judge pursuant to the consent of the parties entered under

the authority of 28 U.S.C. § 636(c)(2).  For the reasons set forth below, the

Commissioner's final decision is AFFIRMED.

## I.   PROCEDURAL HISTORY

On February 26, 2004, Plaintiff filed an application for SSI.  (Tr. 252.)  On March 31, 2004, Plaintiff filed an application for DIB.  (Tr. 252.)  Both applications alleged a disability onset date of June 30, 2000.  (Tr. 252.)  The applications were denied initially and upon reconsideration, so Plaintiff requested a hearing before an administrative law judge ("ALJ").  (Tr. 252.)  Plaintiff's hearing was held on May 13, 2008, before ALJ Thomas Ciccolini.  (Tr. 532.)  Plaintiff appeared, was represented by counsel, and testified.  (Tr. 252, 532-33.)  A vocational expert ("VE") also appeared and testified at Plaintiff's hearing.  (Tr. 252, 532-33.)

ALJ Ciccolini noted that Plaintiff had previously filed applications for DIB and SSI on September 18, 2000, that alleged a disability onset date of January 19, 2000.  (Tr. 252.)  On August 19, 2003, ALJ Perry Rhew held a hearing on those applications (Tr. 16), and on September 24, 2003, ALJ Rhew determined that Plaintiff was not disabled in relation to those applications (Tr. 25-26, 252).  ALJ Rhew found that Plaintiff had severe impairments, namely tension headaches and temporomandibular joint (TMJ) dysfunction, but that Plaintiff's impairments did not meet or medically equal an impairment in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("the Listings").  (Tr. 18.)  After analyzing the evidence in the record, including Plaintiff's subjective complaints of chronic pain, fatigue, vertigo, confusion, and vomiting (Tr. 17), ALJ Rhew found Plaintiff could perform simple, routine, light work (Tr. 22, 24-25), which precluded her from performing any past work but did not preclude her from performing other work that existed in significant numbers in the national economy (Tr. 25).

On January 23, 2004, the Appeals Council declined to review ALJ Rhew's

decision, which made the decision on those applications the Commissioner's final decision for the period of time between January 19, 2000, and September 24, 2003. (Tr. 7, 252.)  Plaintiff did not challenge that final decision in federal court.

On May 28, 2008, ALJ Ciccolini found Plaintiff not disabled as of September 25, 2003.  (Tr. 260.)  ALJ Ciccolini based his decision in part on the residual functional capacity ("RFC") previously determined by ALJ Rhew, which ALJ Ciccolini adopted because he determined that there was no new or material record evidence that showed a change in Plaintiff's condition since ALJ Rhew's decision.  (Tr. 255.)  On March 18, 2010, the Appeals Council declined to review ALJ Ciccolini's decision, so ALJ Ciccolini's decision became the Commissioner's final decision.  (Tr. 242.)  On May 20, 2010, Plaintiff timely filed this cause of action in this Court.  (Doc. No. 1.)

Plaintiff asserts three assignments of error:  (1) the ALJ erroneously failed to mention and explain how Plaintiff's impairments did not meet or medically equal specific impairments in the Listings, including Listing 12.07; (2) the ALJ erroneously adopted Plaintiff's prior RFC as determined by ALJ Rhew; and (3) the ALJ erroneously inferred that Plaintiff's lack of repetitive medical treatment led to the conclusion that Plaintiff's subjective complaints of her symptoms and limitations were not credible.

## II.  EVIDENCE

### A.    Personal and Vocational Evidence

Plaintiff was twenty-five years old at the time of her alleged disability onset date and thirty-three years old at the time of her hearing before ALJ Ciccolini.  (Tr. 536.) She has at least a high school education; is able to communicate in English; and has past relevant work as a teacher, cashier/manager, and manager.  (Tr. 259.)

3

**B.    Medical Evidence**

On November 6, 2003, Plaintiff saw her treating neurologist, Dr. Sagarika Nayak, M.D., for the first time since 2000.  (Tr. 392.)  Dr. Nayak reported the following.  Dr. Nayak's impression was that Plaintiff has incurable migraine headaches (Tr. 394) and that Plaintiff would never be fully pain free (Tr. 392), but that many of Plaintiff's pain problems "most likely arise from psychiatric problems," (Tr. 392).  Therefore, Dr. Nayak would not treat Plaintiff's headaches.  (Tr. 392.)  Although Dr. Nayak recommended at a prior visit that Plaintiff see a psychologist named "Dr. Green," Plaintiff never presented to Dr. Green.  (Tr. 393.)  Dr. Nayak's neurological examination of Plaintiff was normal. (Tr. 393-94.)  Dr. Nayak prescribed Plaintiff Provigil to boost Plaintiff's energy, recommended that Plaintiff obtain psychometric testing with a "Dr. Cohen" at Lakewood Hospital, and recommended a psychological evaluation and counseling with Dr. Green. (Tr. 394.)

On April 29, 2004, Plaintiff presented to Dr. Nayak for a follow-up examination. (Tr. 418.)  Dr. Nayak reported the following.  Plaintiff underwent psychometric testing with Dr. Cohen, and the psychometric testing showed no cognitive or memory problems.  (Tr. 418.)  Personality testing performed by Dr. Cohen suggested an extensive use of repression and a possibility of histrionic conversion disorder.[1]  (Tr. 418.)  Dr. Nayak's neurological testing was again normal, and Dr. Nayak recommended that Plaintiff obtain counseling from Dr. Green and, if necessary, medication.  (Tr. 418.)

On December 6, 2004, state agency psychologist Dr. Carl L. Tishler, Ph.D.,

---

[1] The record does not appear to contain the medical records from Dr. Cohen.

4

performed a mental RFC assessment of Plaintiff (Tr. 452) and completed a Psychiatric Review Technique form (Tr. 456).  In his mental RFC assessment, Dr. Tishler determined that Plaintiff suffered moderate limitations in her abilities to understand, remember, and carry out detailed instructions; maintain attention and concentration in for extended periods; complete a normal workday and workweek without interruptions from psychologically based symptoms; and perform at a consistent pace without an unreasonable number and length of rest periods.  (Tr. 452-53.)  Dr. Tishler found Plaintiff not significantly limited in all other areas of functioning.  (Tr. 452-53.)  In conclusion, Dr. Tishler adopted the RFC from the Commissioner's final decision dated September 24, 2003—that Plaintiff could perform simple, routine work activities secondary to psychological factors related to her medical condition—because "there is no medical evidence to suggest a significant change in function from the time of the ALJ decision."  (Tr. 454.)

In his Psychiatric Review Technique, Dr. Tishler reviewed Plaintiff under Listing 12.07 and determined that Plaintiff had moderate difficulties in maintaining concentration, persistence, or pace; mild restrictions in the ability to perform activities of daily living and maintaining social functioning; and no episodes of decompensation. (Tr. 466.)

On June 9, 2005, state agency reviewing psychologist Dr. Vicki Casterline, Ph.D., reviewed and affirmed Dr. Tishler's findings.  (Tr. 454, 456, 500.)

On December 8, 2004, state agency reviewing physician Dr. Elizabeth Das, M.D., completed a physical RFC assessment of Plaintiff.  (Tr. 470-77.)  Dr. Das found Plaintiff could occasionally lift 20 pounds; frequently lift 10 pounds; sit with normal

breaks for about 6 hours in an 8-hour workday; and stand/walk with normal breaks for about 6 hours in an 8-hour workday.  (Tr. 471.)  Dr. Das found that Plaintiff did not suffer any other limitations.  (Tr. 471-76.)  Dr. Das concluded that there was "[n]o significant change in conditions from date of ALJ decision, 9/24/03 to date last insured of 12/31/03."  (Tr. 471.)

On April 21, 2005, state agency reviewing physician Dr. William R. Kelley, M.D., reviewed and affirmed Dr. Das's findings.  (Tr. 477.)

On May 16, 2005, Plaintiff presented to psychologist Dr. Ronald G. Smith, Ph.D., upon referral from Dr. James Rais, Ph.D.  (Tr. 495.)  Dr. Smith reported that Plaintiff reported the following.  Plaintiff began feeling ill in 1999.  (Tr. 496.)  Plaintiff wakes up every morning with a bloody nose.  (Tr. 496.)  She often feels nauseous and vomits approximately once a month.  (Tr. 496.)  She is forgetful and becomes upset with changes in her routine.  (Tr. 496.)  She cannot go to the grocery store or other stores because she becomes "overwhelmed," "turned around," and "nervous."  (Tr. 496, 497.)  She shakes a lot so it is difficult for her to write, and reading makes her headaches worse.  (Tr. 496.)

No medications have helped Plaintiff with her headache pain.  (Tr. 496.)  Plaintiff has not received psychiatric treatment.  (Tr. 496.)  She has trouble falling asleep and getting out of bed after waking up because of her headache pain.  (Tr. 496.)  She has to move slowly and requires help from her family "all of the time."  (Tr. 496-97.)  She washes the dishes slowly, and she requires breaks when mopping the floor because she becomes dizzy when she bends over to wring out the mop.  (Tr. 497.)

Plaintiff reported that she was able to maintain attention and concentration

6

except when she feels disorganized from dizzy spells and headache pain.  (Tr. 497.)

Dr. Smith opined that Plaintiff would be able to handle funds if any were awarded to

her; that her ability to perform simple, one or two-step job instructions would be

compromised by her constant headaches, dizzy spells, and feelings of faintness; and

that her ability to relate to the public, coworkers, and supervisors would be good.  (Tr.

497.)

Dr. Smith did not diagnose Plaintiff with any impairments or disorders, although

he "[s]uspected" a "neurological and/or vestibular problem."  (Tr. 498.)  Dr. Smith

assigned Plaintiff a Global Assessment of Functioning ("GAF") score of 65.[2] (Tr. 498.)

On July 11, 2005, Plaintiff presented to Dr. Jennifer Snyder, M.D., as a new

patient.  (Tr. 505.)  Dr. Snyder reported that Plaintiff's main complaint was headaches

for which no medication or past doctors were able to help.  (Tr. 505.)  Dr. Snyder

believed that Plaintiff's headaches were not migraines.  (Tr. 505.)  Dr. Snyder

prescribed Plaintiff Cymbalta, recommended that Plaintiff obtain an MRI, and

recommended that Plaintiff see a neurologist, "Dr. Dick."  (Tr. 505.)

On September 14, 2005, Plaintiff underwent a brain MRI.  (Tr. 506.)  Dr. Snyder

reported that the MRI results were normal.  (Tr. 504 506.)

On November 30, 2005, Plaintiff presented to Dr. Snyder for a follow-up.  (Tr.

514.)  Dr. Snyder reported that Plaintiff's chronic daily headaches persisted, and that

---

[2] A GAF score between 61 and 70 indicates some mild symptoms or some difficulty in social, occupational, or school functioning.  A person who scores in this range may have a depressed mood, mild insomnia, or occasional truancy, but is generally functioning pretty well and has some meaningful interpersonal relationships.  *See Diagnostic and Statistical Manual of Mental Disorders* 34 (American Psychiatric Association, 4th ed. rev., 2000).

7

Plaintiff's Cymbalta medication made Plaintiff nauseous so Plaintiff stopped taking it. (Tr. 514.)  Dr. Snyder reported that Plaintiff desired to go to the Diamond Headache Clinic in Chicago, and Dr. Snyder supported Plaintiff's intention to go there.  (Tr. 514.)

On December 5, 2005, Dr. Snyder filled out a Medical Source Statement and reported her assessment of Plaintiff's physical abilities.  (Tr. 508-09.)  Dr. Snyder indicated the following.  Plaintiff's ability to sit, lift, carry were not affected by Plaintiff's headaches; but Plaintiff's ability to stand and walk were affected by her headaches. (Tr. 508.)  Plaintiff could stand or walk for 4 hours in an 8-hour workday and for 10 minutes to an hour without interruption.  (Tr. 508.)  Plaintiff required rest periods throughout a workday in addition to normal morning, lunch, and afternoon breaks.  (Tr. 509.)  As to postural limitations, Plaintiff could rarely climb; occasionally balance and crawl; and frequently stoop, crouch, or kneel.  (Tr. 509.)  As to physical functioning, Plaintiff could occasionally reach, handle, feel, push, pull, and perform fine and gross manipulation; and could frequently see hear, and speak.  (Tr. 509.)  As to environmental restrictions, Plaintiff's ability to work in heights, around moving machinery, and in places where she would be exposed to fumes were affected.  (Tr. 509.)

On January 4, 2006, Plaintiff presented to neurologist Dr. Arthur P. Dick, M.D., upon referral from Dr. Snyder.[3]  (Tr. 512.)  Dr. Dick reported the following.  Plaintiff complained of daily headaches ranging from "bad" to "mild" in severity.  (Tr. 512.)

---

[3]  Dr. Dick's letter to Dr. Snyder, which provides Dr. Dick's evaluation of Plaintiff, is dated January 4, *2005*; however, based on the letter's reference to Dr. Snyder, Dr. Snyder's records, and the record evidence as a whole, Plaintiff appears to have presented to Dr. Dick on January 4, 2006.  (*See* Tr. 505.)

Plaintiff reported that, despite having seen twelve prior neurologists and trying fifteen different medications, her headaches have persisted.  (Tr. 512.)  Trigger-point injections and relaxation therapy did not help Plaintiff's pain.  (Tr. 512.)  Dr. Dick concluded that Plaintiff "likely has cervicogenic chronic daily headaches."  (Tr. 512.)  Dr. Dick prescribed Plaintiff Elavil—one of the two last migraine medications that Plaintiff had not yet tried.  (Tr. 512.)  Dr. Dick noted that, if the Elavil did not help Plaintiff, he would give her Indocin and, at that point, Plaintiff would have tried every known medication for migraine headaches.  (Tr. 512.)

Plaintiff did not see Dr. Snyder again until July 9, 2007.  (Tr. 516.)  Dr. Snyder reported the following.  Plaintiff presented to Dr. Snyder to discuss Plaintiff's disability paperwork.  (Tr. 516.)  Plaintiff reported that she did not attend the Diamond Headache Clinic because she had begun undergoing acupuncture treatment that provided relief for her back and neck pain.  (Tr. 516.)  Plaintiff further reported that her headaches subsequently began to worsen so she stopped her acupuncture treatment.  (Tr. 516.)  Plaintiff saw Dr. Dick, but Dr. Dick was not able to provide any new options to relieve Plaintiff of her pain.  (Tr. 516.)  Plaintiff denied any other changes to her medical history.  (Tr. 516.)  Dr. Snyder prescribed Plaintiff Topamax, as Plaintiff did not realize until this time that this medication might help her headaches.  (Tr. 516.)

On April 29, 2008, Plaintiff presented to Dr. Snyder for a follow-up.  (Tr. 517.)  Plaintiff reported she could barely lie down at times because of her headache pain, but otherwise had no new symptoms.  (Tr. 517.)  Plaintiff's neurological examination was normal.  (Tr. 517.)  Dr. Snyder indicated that Plaintiff suffered chronic, daily tension headaches, an intractable migraine variant, and cervicalgia.  (Tr. 518-19.)  Dr. Snyder

prescribed Plaintiff Relpax, a migraine medication, and Lexapro, an antidepressant. (Tr. 518.)

On May 12, 2008, Dr. Snyder wrote a letter indicating that Plaintiff "is still unable to work at all, and she even needs assistance to care for her own children."  (Tr. 515.)

### D.    Hearing Testimony

#### 1.    Plaintiff's Testimony

Plaintiff testified to the following at her hearing on May 13, 2008.  Plaintiff's main problem is headache pain in the left side of her head (and some pain in the right side) that spreads down into her neck.  (Tr. 543.)  She also suffers pain in her lower back. (Tr. 544.)  Her headache pain never disappears; the pain persists and only varies in intensity.  (Tr. 544.)  The headache pain sometimes becomes so intense that she loses her vision and becomes nauseous and dizzy.  (Tr. 544.)  Plaintiff suffers vision loss from her headache pain "[a] couple times a week," which requires her to lie down "for hours."  (*See* Tr. 545-46.)  She must lie down to nap twice a day to alleviate her headache pain (Tr. 544, 546),  and the pain prevents her from getting out of bed at least once a week (Tr. 546).  The severity of Plaintiff's headache pain has not changed since December of 2003.  (*See* Tr. 545-46.)

Plaintiff's condition prevents Plaintiff from dancing as she used to do.  (Tr. 548.) She cannot go anywhere without planning first, as stress makes her condition worse and she needs to plan on resting adequately before venturing out of the house.  (Tr. 548.)  Plaintiff stays at home often because car rides make her more nauseous.  (Tr. 546.)

Plaintiff has two children aged three and six, with whom Plaintiff is able to

10

interact in such activities as coloring or watching educational television.  (Tr. 549, 550.)
She has help managing her household "around the clock."[4]  (Tr. 546, 550.)  She cannot
drive (Tr. 547), but she has an active social life with her family as her family visits her
often (Tr. 550).  Plaintiff is able to read for approximately ten minutes at a time before it
causes her some pain and she is required to take a break.  (Tr. 550.)

Over the past five years leading up to Plaintiff's hearing, Plaintiff has tried "every
medication for migraines," and tried changing her contraceptive prescription to compare
hormonal effects, but her headache pain has persisted.  (Tr. 546-47.)  Demerol and
Botox injections temporarily relieved her pain upon the first treatment, but subsequent
treatments became progressively less effective.  (Tr. 547.)  Plaintiff was prescribed two
new medications approximately two weeks before her hearing, but they did not relieve
her pain and caused her to become severely depressed so she stopped taking them.
(Tr. 547.)  She finds that over-the-counter Advil helps relieve her back pain, but
otherwise she does not presently take any medications for her headache pain.  (Tr.
547.)  Other methods of pain relief, such as heating pads, helped relieve her pain in the
past, but in recent years they have become ineffective.  (Tr. 547.)

Plaintiff's ability to manipulate and grasp with her hands is "pretty good,"
although her hands "shake a lot."  (Tr. 541.)  She is able to pick up paperclips and
coins.  (Tr. 541.)  She often becomes dizzy when she stands and, therefore, must sit
down often.  (Tr. 541.)  When she walks she becomes dizzy (Tr. 541) and "everything is

---

[4] Plaintiff's testimony does not clearly indicate who helps Plaintiff with her
household, although she testified that her family, in general, visits her often.
(*See* Tr. 546, 550.)

11

a little crooked," so she "walk[s] a little crooked" (Tr. 547-48).  Shifting positions between sitting to standing helps her.  (Tr. 542.)

Plaintiff can lift approximately twenty pounds.  (Tr. 541.)  High production pace and activity makes her condition worse because she is "a little slow in responding to everything," and stress induces her pain.  (Tr. 542.)  She has no problems interacting and dealing with the public, co-workers, or supervisors, although she has developed anxiety.  (Tr. 542.)  She would not feel secure in unprotected heights.  (Tr. 542-43.)  She cannot drive.  (Tr. 543.)  Although she can bend and stoop, she cannot do so quickly because it would throw her off balance.  (Tr. 543.)  She does not need any special devices such as glasses.  (Tr. 543.)

Plaintiff mentioned that she was severely depressed a couple of weeks before her hearing when she tried two new medications prescribed by her doctor.  (Tr. 547.)  She has not, however, been hospitalized in a crisis intervention center for any psychiatric or psychological disorder.  (Tr. 549.)

### 2.    Plaintiff's Attorney's Conversation with the ALJ Regarding Listing 12.07

The ALJ noticed during the hearing that, although Plaintiff had mentioned depression throughout her testimony, Plaintiff's counsel had not mentioned depression or whether Plaintiff had been treated for any psychological disorders.  (Tr. 548.)  The ALJ asked Plaintiff's counsel whether Plaintiff was alleging that she suffered depression as a severe impairment, and whether the ALJ should consider whether Plaintiff suffered depression as a severe impairment.  (Tr. 547.)  Plaintiff's counsel responded that "it wasn't during that time period," and "it's hard to say . . . because there was no

12

diagnosis made," so "I'm thinking that it was more of a 12.07 situation as opposed to depression."  (Tr. 548-49.)

### 3.    The VE's Testimony

The ALJ explained to the VE that he did not believe Plaintiff could perform her past relevant work as a teacher.  (Tr. 552.)  The ALJ then proposed the following hypothetical to the VE:

> Let me ask you to consider a claimant similar to this fine lady with the following residual functional capacity . . . .   I feel that somebody similar to her would be limited to a sedentary RFC with a sit/stand option . . . .  [B]y sedentary I mean work lifting no more than ten pounds at a time and occasionally lifting or carrying articles like dockets, files, ledgers, small tools. In regards to mental limitations, the work should be low stress and let me define low stress.  Low stress means low production quotas.  Not no production quotas, low production quotas and there should be no high pace. In regards to environmental limitations, there should be no moving machinery or gadgets or hazards and there should be no unprotected heights . . . . There should be no high concentration of dust, fumes and gases. So basically I'm describing an environmentally clean closed work environment. In regards to postural limitations and manipulation limitations, there should be no frequent bending or stooping.

(Tr. 551-53.)  The VE testified that such a hypothetical person could perform sedentary work as:  a receptionist, for which there were 3,000 positions regionally and 300,000 positions nationally (Tr. 553); an information clerk, for which there were 500 positions regionally and 45,000 positions nationally (Tr. 554); a telephone solicitor, for which there were 2,000 positions regionally and 100,000 positions nationally (Tr. 554); and a final assembler, for which there were 400 positions regionally and 30,000 positions nationally (Tr. 554-55).  The VE indicated that he reduced the numbers of jobs in the national economy "drastically" from the numbers in the Dictionary of Occupational Titles ("DOT") to accommodate the unique limitations of the ALJ's hypothetical person.  (Tr.

13

553-55.)

Plaintiff's counsel asked the VE whether the ALJ's hypothetical person could perform any of the proffered jobs if the person missed work once a week on a regular basis, or if the person were completely off task fifteen percent of the time.  (Tr. 555.) The VE testified that a person with such limitations would not be able to perform the jobs to which he testified.  (Tr. 555.)

The VE testified that her testimony was consistent with the DOT and its companion publications, the Selected Characteristics of Occupation, as well as based on such sources as the Bureau of Labor and Statistics, the Census Code Data, other professional literature, and her own experience.  (Tr. 537-38.)

### III.    STANDARD FOR DISABILITY

A claimant is entitled to receive benefits under the Social Security Act when she establishes disability within the meaning of the Act.  20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.,* 667 F.2d 524 (6th Cir. 1981).  A claimant is considered disabled when she cannot perform "substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  20 C.F.R. § 416.905(a).  To receive SSI benefits, a recipient must also meet certain income and resource limitations.  20 C.F.R. §§ 416.1100 and 416.1201.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process.  20 C.F.R. §§ 404.1520(a)(4) and 416.920(a)(4); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).  First, the claimant must demonstrate

14

that she is not currently engaged in "substantial gainful activity" at the time she seeks disability benefits.  20 C.F.R. §§ 404.1520(b) and 416.920(b).  Second, the claimant must show that she suffers from a "severe impairment" in order to warrant a finding of disability.  20 C.F.R. §§ 404.1520(c) and 416.920(c).  A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities."  *Abbot*, 905 F.2d at 923.  Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment meets a listed impairment, the claimant is presumed to be disabled regardless of age, education or work experience.  20 C.F.R. §§ 404.1520(d) and 416.920(d).  Fourth, if the claimant's impairment does not prevent her from doing her past relevant work, the claimant is not disabled.  20 C.F.R. §§ 404.1520(e)-(f) and 416.920(e)-(f).  For the fifth and final step, even if the claimant's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled.  20 C.F.R. §§ 404.1520(g), 404.1560(c), and 416.920(g).

### IV.  SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.   The claimant met the insured status requirements of the Social Security Act through December 31, 2003.

2.   The claimant has not engaged in substantial gainful activity since September 25, 2003, the alleged onset date.

3.   The claimant has the following severe impairments: temporomandibular joint (TMJ) dysfunction and tension headaches.

4.   The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed

impairments in 20 CFR Part 404, Subpart P, Appendix 1.

5.  After careful consideration of the entire record, I find that the evidence does not demonstrate a change in Ms. Hernandez-Jeans['] condition since the prior Administrative Law Judge's decision issued September 24, 2003.  Therefore, his decision is binding and I must adopt the residual functional capacity given in his decision . . . . Specifically, I find that the claimant has the residual functional capacity to perform simple routine light work.

6.  The claimant is unable to perform her past relevant work.

. . . . .

9.  Transferability of job skills is not an issue because the claimant does not have past relevant work.

10.  Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform.

11.  The claimant has not been under a disability, as defined in the Social Security Act, from September 25, 2003 through the date of this decision.

(Tr. 254-60.)

## V.    LAW & ANALYSIS

### A.    Standard of Review

Judicial review of the Commissioner's decision is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards.  *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010).  Review must be based on the record as a whole.  *Heston v. Comm'r of Social Security*, 245 F.3d 528, 535 (6th Cir. 2001).  The court may look into any evidence in the record to determine if the ALJ's decision is supported by substantial evidence, regardless of whether it has actually been cited by the ALJ.  *Id.*  However, the

court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence.  *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

The Commissioner's conclusions must be affirmed absent a determination that the ALJ failed to apply the correct legal standards or made findings of fact unsupported by substantial evidence in the record.  *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009).  Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  *Brainard*, 889 F.2d at 681.  A decision supported by substantial evidence will not be overturned even though substantial evidence supports the opposite conclusion.  *Ealy*, 594 F.3d at 512.

**B.    The ALJ's Step Three Analysis**

Plaintiff argues that ALJ Ciccolini erroneously failed to specify which Listings he considered at Step Three of his analysis—particularly Listing 12.07—and explain how Plaintiff's impairments, alone or in combination, did not meet or medically equal those Listings.  Although the Court finds that ALJ Ciccolini's Step Three Analysis could have been more thorough, his lack of thoroughness is not a basis for remand here.

Plaintiff's attorney indicated at Plaintiff's hearing that Plaintiff was basing her claim for disability in part on Listing 12.07.  Listing 12.07 is titled "Somatoform Disorders:  Physical symptoms for which there are no demonstrable organic findings or known physiological mechanisms," and provides the following:

The required level of severity for these disorders is met when the requirements in both A and B are satisfied:

17

A. Medically documented by evidence of one of the following:

    1.  A history of multiple physical symptoms of several years duration, beginning before age 30, that have caused the individual to take medicine frequently, see a physician often and alter life patterns significantly; or

    2.  Persistent nonorganic disturbance of one of the following:

        a.  Vision; or

        b.  Speech; or

        c.  Hearing; or

        d.  Use of a limb; or

        e.  Movement and its control (e.g., coordination disturbance, psychogenic seizures, akinesia, dyskinesia; or

        f.  Sensation (e.g., diminished or heightened).

    3.  Unrealistic interpretation of physical signs or sensations associated with the preoccupation or belief that one has a serious disease or injury;

And

B. Resulting in at least two of the following:

    1.  Marked restriction of activities of daily living; or

    2.  Marked difficulties in maintaining social functioning; or

    3.  Marked difficulties in maintaining concentration, persistence, or pace; or

    4.  Repeated episodes of decompensation, each of extended duration.

Listing 12.07.

ALJ Ciccolini found that Plaintiff suffered two severe impairments: temporomandibular joint (TMJ) dysfunction and tension headaches.  (Tr. 254.)  ALJ Ciccolini's discussion of whether Plaintiff's impairments, either alone or in combination,

18

met or medically equaled an impairment in the Listings consisted of one paragraph:

> No treating or examining physician has indicated findings that would satisfy the severity requirements of any listed impairment.  In reaching the conclusion that the claimant does not have an impairment or combination of impairments that medically meet or equal a listed impairment, I also considered the opinion of the State Agency medical consultants who evaluated this issue at the initial and reconsideration levels of the administrative review process and reached the same conclusion.

(Tr. 255.)

Although ALJ Ciccolini failed to specify which impairments in the Listings he considered, there is no heightened articulation standard at Step Three of an ALJ's analysis, *Bledsoe v. Barnhart*, 165 F. App'x 408, 411 (6th Cir. 2006), and "[n]o principle of administrative law or common sense requires us to remand a case in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result," *Shkabari v. Gonzales*, 427 F.3d 324, 328 (6th Cir. 2005).  ALJ Ciccolini explained that he relied in part on the findings of state agency medical consultants to conclude that Plaintiff's impairments did not meet or medically equal an impairment in the Listings.  State agency reviewing psychologist Dr. Tishler evaluated Plaintiff's mental RFC under Listing 12.07 and determined that Plaintiff had moderate difficulties in maintaining concentration, persistence, or pace; mild restrictions in the ability to perform activities of daily living and maintaining social functioning; and no episodes of decompensation.  (Tr. 466.)  Pursuant to this evaluation, Plaintiff fails to meet Listing 12.07's "B" criteria and, therefore, fails to meet Listing 12.07.  Plaintiff does not explain how the state agency medical consultants' findings are inadequate to support the ALJ's conclusion, and Plaintiff does not cite to any evidence that shows that she could meet Listing 12.07.  The Court concludes that the ALJ's Step Three determination is

19

supported by substantial evidence and that remand on this issue is not necessary.

**C.    The ALJ's Adoption of Plaintiff's Prior RFC**

Plaintiff argues that ALJ Ciccolini erroneously adopted ALJ Rhew's RFC as set forth in the Commissioner's final decision dated September 24, 2003.  The Court disagrees.  Absent new and material evidence of a change in a claimant's condition, a subsequent ALJ is bound by the findings of a previous ALJ.  *See Drummond v. Comm'r of Soc. Sec.*, 126 F.3d 837, 842 (6th Cir. 1997); A.R. 98-4(6).  Plaintiff contends that the record evidence obtained after September 24, 2003, is new, material, and shows that Plaintiff's condition has changed since September 24, 2003, such that a new RFC assessment was warranted.  But substantial evidence supports ALJ Ciccolini's conclusion that the record evidence obtained after September 24, 2003, shows Plaintiff's condition had not changed.

In her prior applications, Plaintiff complained of debilitating headaches with secondary symptoms such as dizziness, attention and memory deficits, nausea, and fatigue.  Plaintiff's primary impairments in her present applications are the same.  ALJ Ciccolini noted that Dr. Snyder's opinion of Plaintiff's physical capacity supported the conclusion that Plaintiff could perform light work.  (Tr. 258.)  Moreover, ALJ Ciccolini gave great weight to the opinions of state agency reviewing psychologist Dr. Tishler and state agency reviewing physician Dr. Das that Plaintiff's condition had not changed (*i.e.*, that Plaintiff continued to be able to perform simple, routine light work), as those opinions were consistent with the record evidence.  (Tr. 257, 258.)

Plaintiff does not argue that the evidence upon which ALJ Ciccolini relied is inadequate to support his decision.  Rather, Plaintiff argues that record evidence since

20

September 24, 2003, "could provide a basis for a different finding."  (Pl.'s Br. 12.)

Plaintiff argues an incorrect legal standard, as a decision supported by substantial

evidence will not be overturned even though substantial evidence supports the opposite

conclusion.  *Ealy*, 594 F.3d at 512.  Furthermore, the evidence to which Plaintiff cites

does not show that Plaintiff's condition changed.

Plaintiff contends that Dr. Nayak diagnosed her with a conversion/histrionic

personality disorder with underlying depression and anxiety.  This is inaccurate.  Dr.

Nayak opined that personality testing performed by Dr. Cohen only "suggested . . . a

possibility of histrionic conversion disorder."  (Tr. 418.)  There is no evidence in the

record since September 24, 2003, indicating that Plaintiff was formally diagnosed

with"histrionic personality disorder," depression, anxiety, or any other psychological

disorder.

Plaintiff notes that Dr. Dick reported that Plaintiff had tried almost every migraine

medication; that Plaintiff reported that none of the medications helped her; and that

Plaintiff had a decreased range of motion in her neck with increased cervical paraspinal

muscle tone.  Moreover, Plaintiff contends that Dr. Dick diagnosed Plaintiff with

cervicogenic chronic daily headaches.  This evidence, however, does not show that

Plaintiff's condition changed.  Dr. Dick's assessment reveals that Plaintiff suffered the

same impairments about which Plaintiff complained in her prior application:  headaches

and related symptoms for which she could not find relief.  Moreover, Plaintiff has not

explained the meaning or significance of the fact that Dr. Dick found that Plaintiff had

decreased range of motion in her neck with increased cervical paraspinal muscle tone;

indeed, Dr. Dick did not provide any explanation for how these findings affected

Plaintiff's ability to function, but opined that Plaintiff's neurological examination was otherwise essentially normal.  (Tr. 512.)

Plaintiff notes that Dr. Smith reported that Plaintiff's "ability to follow simple one or two step instructions will be compromised by her constant headache and sensitivity to the development of dizzy spells and feelings of faintness."  (Tr. 497.)  Plaintiff fails to explain how this opinion is inconsistent with simple, routine, light work—especially in light of Dr. Smith's assignment of a GAF score of 65, which indicates only some mild difficulties in occupation functioning.  Moreover, Dr. Smith's opinion appears to have been based on Plaintiff's subjective reports of the frequency and severity of her headaches.  (*See* Tr. 497.)

Finally, Plaintiff notes that Dr. Snyder reported that multiple treatments did not help Plaintiff, and opined that Plaintiff was unable to work and needed assistance to care for her children.  (*See* Tr. 515.)  However, Dr. Snyder's observation that other treatments did not seem to help Plaintiff's headaches is not new and does not speak to Plaintiff's ability to perform simple, routine light work.  Furthermore, Dr. Snyder's opinion that Plaintiff was unable to work is not entitled to significant weight because the determination of disability is reserved to the Commissioner.  S*ee* 20 C.F.R. § 404.1527(e); SSR 96-5p.

In sum, the record evidence after September 24, 2003, upon which ALJ Ciccolini based his finding that Plaintiff's condition did not change was more than a scintilla of evidence that was relevant to his disposition, and was sufficient for a reasonable mind to accept as adequate to support his conclusion.  Therefore, ALJ Ciccolini did not err in adopting Plaintiff's prior RFC as established by ALJ Rhew.

**D.    The ALJ's Assessment of Plaintiff's Credibility**

Plaintiff argues that ALJ Ciccolini improperly inferred that Plaintiff's lack of repetitive medical treatment indicated that Plaintiff's subjective statements of her pain were not credible, and that this error warrants remand.  Even if it were error to base a credibility determination solely on a claimant's lack of repetitive medical treatment, ALJ Ciccolini did not do so here.  ALJ Ciccolini based his credibility determination not only on Plaintiff's lack of repetitive medical treatment, but also on his observations that: (1) Plaintiff's subjective statements were not consistent with or substantiated by the overall objective medical evidence, which showed, for example, consistently "normal" neurological examinations, no cognitive or memory problems, and a functional physical capacity to perform light work; (2) Plaintiff's failure to take medication that she recently had been prescribed without any objective evidence that she suffered adverse side-effects from the medication (Tr. 258); (3) Plaintiff's activities of daily living; and (4) Plaintiff's presentation at her hearing.  (Tr. 256-58.)  Plaintiff does not explain how the ALJ's entire analysis of Plaintiff's credibility was erroneous.  Therefore, there is no basis to conclude that the ALJ's credibility assessment was erroneous and that remand is necessary.

## VI.    CONCLUSION

For the foregoing reasons, the Commissioner's final decision is AFFIRMED.

**IT IS SO ORDERED**.

s/ *Nancy A. Vecchiarelli*
U.S. Magistrate Judge

Date: July 20, 2011

23